DECISION
{¶ 1} Relator, Megan Worthy, filed this original action requesting that this court issue a writ of mandamus ordering respondent, Ohio State Highway Patrol Retirement *Page 2 
System ("OSHPRS"), to vacate its decision denying her application for a disability pension under R.C. 5505.18.
 {¶ 2} This court referred this matter to a magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court grant a writ of mandamus ordering respondent to vacate its decision, seek clarification of the medical report of Jeffrey R. Blood, M.D., and enter a new decision regarding relator's application in accordance with the magistrate's decision. (Attached as Appendix A.) No party has objected to the magistrate's findings of fact, and we adopt them as our own. Both relator and respondent filed objections to the magistrate's conclusions of law.
 {¶ 3} In its objection, OSHPRS argues that the magistrate erred in requiring clarification of Dr. Blood's report. We disagree.
 {¶ 4} At the outset, we note that citations in the magistrate's decision to sections within R.C. Chapter 5508 are incorrect. These citations should refer to sections within R.C. Chapter 5505. Our final opinion will change them accordingly.
 {¶ 5} R.C. 5505.18(A) requires the OSHPRS board to appoint a "competent health-care professional or professionals" to examine an applicant and to file a written report with the board. The medical report must contain the following information: (1) whether the applicant is totally incapacitated for duty; (2) whether the applicant's incapacity is expected to be permanent; and (3) the cause of the incapacity. R.C. 5505.19(A). In determining whether an applicant qualifies for disability retirement, the *Page 3 
board "shall consider the written medical or psychological report, opinions, statements, and other competent evidence in making its determination." Id.
 {¶ 6} Here, the board appointed Dr. Blood to examine relator and submit a medical report. The magistrate concluded that Dr. Blood's opinion, as reflected in his report, was equivocal. Specifically, Dr. Blood's narrative indicates that relator's incapacity is permanent, but his marks on the attending medical evaluator form indicate that relator could return to work within the foreseeable future. His narrative and the form also indicate that claimant should be re-evaluated in one year. Given these inconsistencies, the magistrate recommended that we order the board to seek clarification of Dr. Blood's report as to the critical question whether relator's incapacity is permanent.
 {¶ 7} While not conceding that Dr. Blood's report is equivocal, respondent argues that, even if Dr. Blood's report is eliminated from consideration, the record contains evidence sufficient to support the board's decision. However, we agree with the magistrate's conclusion that, because the board admittedly relied, at least in part, on Dr. Blood's report in deciding to deny relator's application, clarification of Dr. Blood's report is necessary. Although the board has statutory authority to consider all the evidence in the record before it, here, the board chose to rely on a report we find to be equivocal. Therefore, further clarification of the report is needed. We overrule OSHPRS's objection.
 {¶ 8} In her objection, relator argues that the magistrate erred by not simply ordering the board to vacate its decision and to provide benefits retroactively to May 5, 2006, because all treating and examining physicians have determined that relator is *Page 4 
totally and permanently incapacitated. While Dr. Blood's report indicates that relator should be re-evaluated in one year, relator argues that this re-evaluation is not inconsistent with a finding of permanent disability. R.C. 5505.18(D) requires members under 60 on a disability pension to undergo an annual re-examination. This annual exam requirement, relator argues, indicates a legislative intent to allow benefits to an applicant with a disability that lasts only 12 months. Like the magistrate, however, we decline to incorporate relator's concept of permanence into the statute. Moreover, we have already concluded that Dr. Blood's report is equivocal and must be clarified to determine his opinion as to whether relator's incapacity is permanent. Therefore, we cannot rely on it to conclude that Dr. Blood intended to declare relator incapacitated for 12 months or more. Accordingly, we overrule relator's objection.
 {¶ 9} Having overruled the objections to the magistrate's decision, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, except to the extent we have changed the citations to sections within R.C. Chapter 5508 to the applicable sections within R.C. Chapter 5505 and corrected other typographical errors. In accordance with the magistrate's decision, we grant a writ of mandamus ordering respondent to vacate its decision denying relator's application for a disability pension, to seek written clarification from Dr. Blood in order to resolve the ambiguity in his report, and, thereafter, to enter a new decision regarding relator's application.
Objections overruled, writ of mandamus granted.
 BRYANT and KLATT, JJ., concur. *Page 5 
 APPENDIX A MAGISTRATE'S DECISION IN MANDAMUS {¶ 10} In this original action, relator, Megan Worthy, requests a writ of mandamus ordering respondent, Ohio State Highway Patrol Retirement System ("OSHPRS"), to vacate its decision denying her application for a disability pension under R.C. 5505.18 and to enter a decision granting her application. *Page 6 
Findings of Fact: {¶ 11} 1. In June 1990, relator began her employment as a trooper with the Ohio State Highway Patrol ("OSHP").
 {¶ 12} 2. On July 13, 2005, relator was injured in an off-duty motor vehicle accident.
 {¶ 13} 3. On February 14, 2006, orthopedic surgeon Louis J. Unverferth, M.D., wrote to relator's attending physician Terrance A. Castor, M.D.:
 * * * As you know, she has been quite a diagnostic problem and she is very frustrated because of it. From a clinical standpoint, she continues to demonstrate significant pain over the right AC joint and all signs and symptoms are compatible with a chronic bicipital problem. It seems as though that maybe even clinically she is subluxing her biceps tendon which is causing a lot of her shoulder pain. This is a very difficult clinical diagnosis to make and it is basically impossible to confirm by any kind of MRI or even x-rays.
 Therefore, I am recommending the following. I would like to first arthroscope her right shoulder joint just to take a look to see whether or not there is any additional pathology. Then I believe we should go forward with an open debridement of her right AC joint and a bicipital tenodesis. She is well aware of the fact that this may not be helpful to her but I know of nothing else to offer her at this time.
 {¶ 14} 4. On March 6, 2006, relator underwent an arthroscopic examination and surgery performed by Dr. Unverferth. In his operative report, Dr. Unverferth wrote:
 PREOPERATIVE DIAGNOSES:
 [One] Right acromioclavicular joint arthritis.
 [Two] Chronic impingement syndrome, right shoulder.
 [Three] Possible bicipital tendinitis.
 POSTOPERATIVE DIAGNOSES: *Page 7 
 [One] Right acromioclavicular joint arthritis.
 [Two] Chronic impingement resulting in complete right rotator cuff tear.
 [Three] No bicipital tendinitis.
 OPERATIVE PROCEDURES:
 Exam under anesthesia followed by diagnostic right shoulder arthroscopy consisting of debridement of undersurface tear of the supraspinatus followed then by an open decompression of right shoulder, open repair of rotator cuff tear, excision of outer end of the clavicle, and exploration of biceps tendon revealing no bicipital tendinitis.
 {¶ 15} 5. On April 14, 2006, Dr. Castor wrote a letter to OSHP:
 * * * After reviewing her job description, it is my medical opinion that Trooper Worthy is unable to perform the essential functions of her job and that no modifications will enable her to do so. She is suffering from multiple problems. Her current disability is recent surgery for repair of an extensive rotator cuff tear in her right shoulder. Her recovery has been slow and she has marked limitations of use and mobility in her right arm. The long term prognosis for this injury is guarded and it is probable that she will never regain full mobility and strength in her right arm. Given the fact that she is right-handed and the requirements of her job especially in regards to potentially needing to use force to subdue attackers or to use firearms and to even lift in assisting accident victims and other possible areas, her shoulder problem will likely be prohibitive in her ever being able to perform these functions. Further complicating the problem is the fact that Trooper Worthy has evidence of nerve injury in the right arm manifest by sensory loss and disturbance with pain in the right arm which again further limits use of her right arm. Lastly, Trooper Worthy has had a serious back problem due to a herniated disc with a ruptured displaced disc fragment. While this problem has significantly improved, she is subject to back spasms and pain on an unpredictable basis. Clearly, this would be potentially brought on by the demands of her job in certain situations.
 In summary, it is my medical opinion that given Trooper Worthy's current status and the complexity of her problems and the significant physical demands of her job that she will *Page 8 
with reasonable degree of medical certainty not be able to perform the functions of her job description in the foreseeable future and is likely permanently and totally disabled from serving as a trooper.
 {¶ 16} 6. On May 25, 2006, Dr. Unverferth wrote to Dr. Castor:
 * * * [Unfortunately she is not doing well following her shoulder surgery. Her complaints now are different than what they were preoperatively and I quite frankly do not know what else to do for her. She has seen many different types of doctors and no one can come up with an answer. From an orthopedic standpoint, I have done everything I can and therefore, at the time of the next visit which will be four weeks from now I am going to discharge her from my management. I am sorry I could not be of more help.
 {¶ 17} 7. In May 2006, relator filed with OSHPRS an application for disability benefits on a form provided by OSHPRS. The application form asks the applicant to describe the illness, injuries or conditions that limit ability to work as a trooper. In response to the query, relator wrote:
 Right shoulder injury resulting from off-duty accident, unable to fully use right arm. Neck injury resulting from off duty accident. Back injury.
 {¶ 18} 8. OSHPRS also provides an "Attending Physician Medical Evaluation" form ("attending physician form") to be completed by the applicant's attending physician. The form asks the physician to state "cause of incapacity [What condition(s) are you treating]." It also asks the physician to state a diagnosis. The last section of the form asks the physician to mark the appropriate box describing the applicant's medical situation:
 On the basis of my medical knowledge and examination of the applicant, it is my opinion that the applicant is: *Page 9 
 TOTALLY INCAPACITATED to perform specific job duties and responsibilities in the employ of the patrol, and that such incapacitation is permanent.
 TOTALLY INCAPACITATED to perform specific job duties and responsibilities in the employ of the patrol, at this time but could return to work at sometime in the foreseeable future. Could return to work.
 NOT TOTALLY INCAPACITATED to perform specific job duties and responsibilities in the employ of the patrol, and that such incapacitation is not permanent.
 IS CURRENTLY UNDER TREATMENT AND OUTCOME IS NOT YET DETERMINED.
(Emphasis sic.)
 {¶ 19} 9. In support of her application, relator had Drs. Castor and Unverferth each complete the attending physician form.
 {¶ 20} 10. Dr. Castor completed the form on June 23, 2006.
 {¶ 21} For "cause of incapacity," Dr. Castor wrote: "Neck Pain[,] Painful Shoulder[,] Paresthesia R[ight] arm [and] Low back pain."
 {¶ 22} For "diagnosis," Dr. Castor wrote: "Cervical Sprain[,] Rotator cuff tendinitis and impingement[,] Possible brachial plexus injury [and] Lumbar herniated disc."
 {¶ 23} In the last section of the form, Dr. Castor marked the first box indicating that relator is totally incapacitated and that such incapacitation is permanent.
 {¶ 24} 11. On June 30, 2006, Dr. Unverferth completed the attending physician form.
 {¶ 25} For "cause of incapacity," Dr. Unverferth wrote: "Neck pain[,] painful shoulder[,] paresthesia right arm[,] low back pain [and] depression, anxiety." *Page 10 
 {¶ 26} For "diagnosis," Dr. Unverferth wrote: "Cervical Sprain — C5-6 — Fibromy-algia[,] Rotator cuff Tendonitis and impingement[,] possible brachial plexus injury[,] lumbar herniated disc [and] depression — post traumatic stress disorder."
 {¶ 27} In the last section of the form, Dr. Unverferth marked the first box indicating that relator is totally incapacitated and that such incapacitation is permanent.
 {¶ 28} 12. Relator's application prompted OSHPRS to have relator examined by Jeffrey R. Blood, M.D., on August 11, 2006. Following the examination, Dr. Blood issued a four-page narrative report, stating:
 Impression: Ms. Worthy has diffuse muscle symptoms with muscle nodularity and dermatographia and diffuse tenderness reported throughout the posterior and anterior shoulder extending down to the mid back region and diffusely down the arm to about the elbow level. The main objective finding other than the surgical scar and the abnormalities on the MRI for the shoulder was that the upper arm on the right side measured over 3 cm greater in circumference than the left arm. There is no increased warmth, redness, discoloration or any other finding accompanying what appeared to be diffuse swelling of her upper arm. There is no distal swelling in the hand, and there is no significant measurable difference on side-to-side comparison of circumference for the forearms. She has very limited active range of motion of the right shoulder on physical exam. She indicated that the loss of movement would give her significant problems with driving, and also, she called the office after she left and indicated that she would have difficulty holding onto a shotgun and also drawing a firearm from her holster because of pain and decreased range of motion in her right shoulder.
 The problem is most of her symptoms are very subjective in nature. Clinically she appears to have significant muscular etiology for her symptoms. I am not certain as to why she has the measurable swelling in the right upper arm compared to the left. Some difference could be related to her right hand dominance; however, that would not explain greater than 3 cm difference on side to side comparison.
 Diagnosis: *Page 11 
 Status post repair of right rotator cuff tear. Residual swelling, pain, and loss of motion of the right shoulder.
 Myofascial pain — right cervical strain
 Recommendations: I do not feel that Ms. Worthy would be significantly limited after her rotator cuff repair as reportedly she has had a recent MRI study that showed good postoperative results. I do not feel that the cervical strain offers her significant restrictions either. My concern is the physical findings with significant swelling in the shoulder, her decreased range of motion, and pain that is reported with range of motion. Again, the main objective finding is the significant swelling in her proximal right arm. Because her job requires her to operate a motor vehicle at high rates of speed and also be able to respond in emergency situations aiding victims in automobile accidents or using firearms or unarmed self-defense techniques, unfortunately that would place significant stress on her dominant right arm. It appears that she not only has pronounced subjective complaints but does have objective findings with measurable swelling in her proximal arm. I feel that this would restrict her abilities to safely perform her duties as a State Highway Patrol Trooper. I did feel that this should be considered permanent in that there is no clear identifiable reason yet discovered for her ongoing pain and the swelling that was noted today. I feel she should be re-evaluated in a year.
 {¶ 29} 13. On August 11, 2006, Dr. Blood completed the OSHPRS attending physician form.
 {¶ 30} For "cause of incapacity," Dr. Blood wrote: "R[ight] shoulder[,] neck."
 {¶ 31} For "diagnosis," Dr. Blood wrote: "[Status/Post] R[ight] rotator cuff repair[,] residual swelling/pain R[ight] shoulder/arm [and] myofascial pain/cervical strain."
 {¶ 32} In the last section of the form, Dr. Blood marked the second box containing the following pre-printed remarks followed by Dr. Blood's handwritten remarks:
 TOTALLY INCAPACITATED to perform specific job duties and responsibilities in the employ of the patrol, at this time *Page 12 
but could return to work at sometime in the foreseeable future. Could return to work one year (re-evaluate).
(Emphasis added for handwritten notation.)
 {¶ 33} 14. Earlier, on August 8, 2005, on referral from Dr. Castor, relator was examined by neurologist Albert L. Berarducci, Jr., M.D. Dr. Berarducci also performed an electromyography ("EMG") study.
 {¶ 34} In a separate narrative report dated August 8, 2005, Dr. Berarducci wrote:
 This 39-year-old woman is referred by Dr. Terry Castor for evaluation of neck, right shoulder, arm and hand pain that has been present ever since a motor vehicle accident on 07/13/2005. As a state trooper, now on disability leave, she describes the accident in great detail. What I understand of her description is as follows.
 She says that she was driving at 55 miles per hour when "this woman" pulled in front of her turning left. Ms. Worthy swerved unsuccessfully to miss this automobile. The glancing blow of this impact push[ed] Ms. Worthy's car into the oncoming lane where upon she was impacted by a "semi-tractor-trailer." "I got up into his fuel tank. . ." describes Ms. Worthy. During this entire experience she was fully awake. She did not lose consciousness and does not think that she hit her head. She was "restrained" by seat belts and her air bag did deploy. She remembers little about what impacted what inside her vehicle. She does however remember thinking about her son, who was a passenger in the car and how she attempted to minimize each of the impacts to increase the chance that he would be hurt.
 Immediately on the conclusion of the accident, she felt pain in her shoulder and neck. She also began having headache[s] right from the very start. Pain in the right side of her eye and right face along with pain in her right ear also was part of her initial pain complex. She was taken to an emergency room where upon she was evaluated (those records are not available for review). She was not admitted for any sort of therapy as the workup in the emergency room was all negative. However, two days later she did see Dr. Castor, who recommended MRI scanning of the spine with and without contrast. This was completed on 07/15/2005. I *Page 13 
have reviewed the scan and agree with the final report that there are no significant areas of stenosis. The C5-C6 area reveals a disc bulge that does not compress the spinal cord or the lateral root outlet zones. Routine C-spine films (without flexion/extension views) are also negative by my review. The ultimate diagnosis after this extensive radio-graphic workup was cervical sprain with "probable nerve contusion to right arm" according to Dr. Castor's consult request.
 * * *
 ASSESSMENT: The clinical examination in this case fails to reveal any abnormalities that will allow clinical diagnosis as to the origin of this pain. Since the neurological examination fails to reveal any neurologic deficits, it is presumed that the bulk of her pain is musculoskeletal in origin. I will recommend EMG of the right upper extremity to ensure that there is no occult neuropathic component. If there is, it is not injurious to the point that clinical asymmetries can be found. In any event, she is so recently a survivor of what sounds like a serious enough motor vehicle accident to have been fatal with a little bad luck that it is premature to expect she would be feeling any better than she now is. I urged Ms. Worthy and her mother to be patient with the process of rehabilitation, not expecting medications alone to eliminate the pain. I do not expect that she will remain this uncomfortable indefinitely. She is showing si[gn]s of some spontaneous recovery by history. With enough time and proper rehabilitation, I would expect a full recovery based on today's examination.
 {¶ 35} On August 9, 2005, after conducting an EMG study, Dr. Berarducci wrote:
 ASSESSMENT: Though the description of the motor vehicle accident does not indicate trauma to the right shoulder, there is a theoretic possibility of a stretch injury to the plexus, particularly if Ms. Worthy was clasping tightly to the steering wheel during the two phase collision (see clinical report for details). A subtle dislocation of the right shoulder could have occurred which in turn could then have stretched the lower poles of the brachial plexus causing the EMG abnormalities recorded in this study. The neuropathy recorded is not severe, but does imply that the neuropathic elements of this pain syndrome may respond to neurontin. *Page 14 
 {¶ 36} 15. On July 26, 2006, following referral from Dr. Castor, Joseph Ruane, D.O., wrote:
 * * * [S]he has been in physical therapy at McConnell, but the recovery has been protracted. She complains of diffuse arm pain involving much of the region from the lower cervical area throughout the distal right arm. There are occasional paresthesias, as well as what she describes as true numbness, but this is transient. The most notable pain at this time is a mid humeral discomfort which is present with certain positions. She demonstrated this in the office, and it involves forward flexion and abduction. This ends in tense, shooting pain into the lateral deltoid and mid humeral region.
 * * *
 IMPRESSION
 [One] Right upper extremity and parascapular soft tissue pain of likely multiple etiologies.
 PLAN
 [One] The distribution of her pain, as well as some of the lancinating and shooting qualities, indicate there may be a neuropathic component. Apparently, the EMG was positive, suggesting a brachial neuritis; however, it does not appear that there has been commitment to that being the source of her pain. Her distribution also makes me wonder whether the axillary or other peripheral nerve may be involved. Repeat EMG to test these areas is a consideration.
 * * *
 Overall, her prognosis at this point is uncertain. This seems to be a rather complex case with no clear answers[.] * * *
 {¶ 37} 16. On September 13, 2006, the executive director of the OSHPRS board, Dick Curtis, wrote a memorandum to the board:
 The disability pension application filed by Megan Worthy on June 9, 2006 has been processed through the HPRS and was considered by the Health, Wellness and Disability Committee on August 29, 2006. At that time the Committee *Page 15 
tabled the application for 90 days and advised the applicant to engage in physical therapy to attempt to improve the condition of her arm and shoulder.
 The facts of this case are not unique. She has been examined and tested by numerous doctors and no one has identified the source of the pain she reports. Several of the doctors have advised her that they can no longer provide meaningful treatment for her. She previously participated in therapy and was unable to perform beyond a very limited level. She exhausted all of the medical insurance benefits allocated to physical therapy.
 The independent medical examiner retained by the HPRS finds nothing significantly wrong with her from an objective medical testing and examination perspective, but still determines that she is disabled because she reports pain.
 * * *
 Regarding the HWD Committee's recommendation to reengage in physical therapy, there are problems with that approach. We learned after the Committee's decision that no additional insurance coverage is available for such treatment. The applicant is currently in financial distress and cannot afford to pay for such therapy. The only other alternative is for the HPRS to pay for that therapy. Remembering that medical records in the file state that additional physical therapy is of no value, the cost of such therapy would probably be wasted.
 There are few options in this case. First, the matter could be returned to the HWD Committee for further consideration. Second, since the Committee recommended an intervention that we now know is not available, the Board could consider the matter and make the approval/denial decision without returning the matter to the Committee. Third, we could further engage the applicant in additional medical examinations and testing in an attempt to identify an objective cause of the pain.
 My recommendation is the second option — Board approval or denial of the application. Returning the matter to the Committee adds no additional value to the process. The Committee does not have access to any information that the entire Board does not currently have. Sending the applicant *Page 16 
to other doctors is wasting time and money. It appears that the decision to be made here is whether the Board considers self-reported pain, not supported by objective medical evidence sufficient for granting disability benefits.
 {¶ 38} 17. On September 19, 2006, OSHPRS's consulting physician Earl N. Metz, M.D., wrote a memorandum to Dick Curtis and Valerie Nesbitt, the OSHPRS benefits director:
 At the most recent meeting of the Health, Wellness, and Disability Committee, the case of Megan Worthy was tabled with the understanding that she would undergo additional physical therapy and an additional examination by a psychiatrist before a final decision would be made. Since then, a considerable amount of medical material has been submitted — none of which really sheds any light on the reason for the trooper's apparent disability re: her shoulder. Dick Curtis has put together a thoughtful summary of the problem in a memo dated September 13, 2006. I can not add anything of substance to his formulation. This young woman claims to have virtually no use of her right shoulder yet numerous exams by multiple physicians and testing that includes bone scans, MRI's, x-rays, and EMG's have not identified a cause for her pain or for her apparent inability to abduct her right arm.
 {¶ 39} 18. On September 21, 2006, the board voted to deny relator's application.
 {¶ 40} 19. By letter dated October 5, 2006, relator notified the board that she was appealing the board's decision denying her application.
 {¶ 41} 20. On November 27, 2006, relator underwent an MRI of her cervical spine following another automobile accident. The MRI was interpreted by Dr. Susan Kemp:
 CLINICAL HISTORY: Exacerbation of radicular symptoms status post recent auto accident, C6.
 * * *
 IMPRESSION: *Page 17 
 Mild diffuse disc protrusion at C5-C6 effacing the ventral subarachnoid space without central spinal canal stenosis or cord compression. No asymmetric foraminal narrowing is detected at this level.
 More subtle central disc protrusion at C4-C5 slightly distorting the ventral subarachnoid space also not approaching or compressing the cord.
 {¶ 42} 21. On December 5, 2006, Dr. Castor wrote to Mr. Curtis:
 I am writing this letter in follow-up to my letter dated November 8, 2006 concerning Megan Worthy. Since the prior letter, Mrs. Worthy was involved in another automobile accident in which her car was struck from behind. The accident has resulted in aggravation of her previous neck and right arm symptoms. To further assess the situation, Mrs. Worthy underwent another MRI of the cervical spine on November 27, 2006. The MRI showed mild disc protrusion at the C5-C6 inters pace [sic] and also to a lesser degree at the C4-C5 interspace. The C5-C6 narrowing causes indentation of the sub-arachnoid space. There are no further objective clinical changes compared to the description in my previous communication. Thank you for reconsidering Mrs. Worthy's disability status.
 {¶ 43} 22. On December 12, 2006, Dr. Blood wrote to Dr. Metz at OSHPRS:
 I received a note and additional information sent to me * * * regarding Trooper Worthy. She reportedly was injured in a more recent automobile accident. She had an MRI study performed of her cervical spine, dated 11/27/06. The radiology report indicated that there was mild, diffuse disk protrusion at C5-6 slightly effacing the ventral subarachnoid space but not approaching the cord or resulting in any asymmetric neural foraminal narrowing. There was a more subtle central disk protrusion seen at C4-5 level slightly distorting the ventral subarachnoid space but not approaching or compressing the cord or resulting in any asymmetric foraminal narrowing.
 In reviewing the file of records that I have, there is a previous MRI study. That MRI was dated 7/15/05. The radiologist indicated that at the C4-5 level there was a small diffuse disk bulge with mild effacement of the thecal sac anteriorly. At the *Page 18 
C6-7 level there was a small diffuse disk bulge with superimposed small central disk protrusion causing mild effacement of the thecal sac with no deformity of the spinal cord, and there was no significant foraminal narrowing seen. It appears that although those two studies were performed more than a year apart by different radiologists, the wording is very similar and it appears on the description based on the two MRI reports that there has been no interval change despite the history of the automobile accident. I do not feel based on this information that there is need for an additional examination.
 {¶ 44} 23. On December 21, 2006, Dr. Castor wrote to Mr. Curtis:
 I am writing this letter in follow-up to my letter of December 5, 2006. Mrs. W[or]thy was seen in follow-up on December 13, 2006 as follow-up for high-dose Prednisone therapy for her possible cervical nerve compression. She reported that the Prednisone had no effect in this regard. She had experienced a flare of her lumbar disc problem and the Prednisone did help that. Mrs. Worthy is also suffering from increased depression and has had limited response to anti-depressant therapy. She is involved in counseling. She has had a recent change in her anti-depressant medication. I continue to believe that Mrs. Worthy is currently totally disabled from performing her duties as a highway patrolman and will continue to be so into the foreseeable future as I do not expect improvement sufficient enough to allow her to safely and adequately perform the duties of a patrolman.
 {¶ 45} 24. On January 3, 2007, Dr. Metz wrote a memorandum to Mr. Curtis and Ms. Nesbitt:
 Megan Worthy has an extensive file with the OSHPRS related to her musculo-skeletal problems. I've submitted two previous memos regarding her medical evaluations, the most recent of which is dated September 19, 2006.
 Trooper Worthy submitted additional information in the form of a letter from her personal physician, Dr. Terrance Castor, and a report of a cervical MRI performed on November 11, 2006 [sic]. Dr. Castor noted that the trooper had again been involved in an automobile accident. This information was forwarded to the SHPRS independent examiner, Dr. Jeffery Blood. Dr. Blood reviewed all of the information, including *Page 19 
the fact that there were essentially no changes in the cervical MRI and concluded that there was no reason to change his previous decision that Megan Worthy was capable of continuing her job as a trooper.
 There is no convincing medical evidence to recommend changing the previous dcision [sic] by the Disability Committee.
 {¶ 46} 25. According to the January 11, 2007 minutes of the Health and Wellness and Disability Committee ("HWD committee"), it voted to "table the appeal of Trooper Megan Worthy's disability application pending additional medical evidence."
 {¶ 47} 26. On January 19, 2007, at her own request, relator was re-evaluated by Kathryn Grant, M.D., who conducted an examination on that date. Dr. Grant reported:
 IMPRESSION:
 • Myofacial pain post MVA.
 • [Decreased] [right] should girdle [range of motion].
 • Nature of pain with observed vascular change suggests a causalgia minor.
 • [Right] ulnar compromise at elbow with [decreased] hand strength/deformity.
 PLAN:
 • Thermographic study [right] arm.
 • NCS of axillary musculocutaneous nerves (compare [right and left]).
 • F/u with me next time she is in town.
 {¶ 48} 27. On January 19, 2007, Dr. Grant completed the attending physician form. In the last section of the form, Dr. Grant marked the first box indicating that relator is totally incapacitated and that such incapacitation is permanent.
 {¶ 49} 28. On March 6, 2007, Dr. Metz wrote a memorandum to Mr. Curtis and Ms. Nesbitt:
 Trooper Worthy's file contains three earlier memos from me as well as a detailed summary by Dick Curtis. Ms. Worthy's *Page 20 
complaints continue to be pain in the right arm and shoulder area as well as weakness in the right hand and weakness in abduction of the right shoulder.
 The problem in objective assessment of these symptoms is that there have been few, if any, significant physical or laboratory findings to verify or support her claims. Some of her examiners have suggested that she might have developed "sympathetic reflex dystrophy" (RSD) in the right shoulder and arm. However, physical findings in support of that condition have been meager and a three-phase bone scan was done at the Riverside Hospital in August 2006 which showed normal blood flow bilaterally. In addition, one of her doctors, Dr. Ruane, wrote to Ms. Worthy after that test to assure her that she did not have RSD.
 When Ms. Worthy appeared before the OSHPRS most recently a decision was delayed to give her an opportunity to complete another appointment with a physiatrist she had seen previously in Arlington, Virginia. During that examination, Dr. Kathryn Grant noted tender areas around the right shoulder and weakness in grasp with the right hand. She again raised the possibility of RSD, but her major diagnosis was "myofascial pain post MVA". Her notes indicate that a thermographic study and a nerve conduction study of the right arm might be helpful. We had some question about whether those studies were to be done by Dr. Grant or by her local physicians. I called Dr. Grant's office and learned that there were no diagnostic studies done on the recent visit to Dr. Grant and that their understanding was that they would be done in Ohio. In the meantime, Valerie Nesbitt talked with Ms. Worthy who told her that she had, in turn, talked with her personal physician who reportedly told Ms. Worthy that additional testing would be of no help.
 After a long time and several exams and diagnostic studies, we are left with only the subjective symptom of pain in the right shoulder and arm with no objective data to explain the pain described by Ms. Worthy.
 {¶ 50} 29. On March 16, 2007, at her own request, relator underwent an electrodiagnostic examination performed by Jeffrey A. Strakowski, M.D., who wrote:
 Impression: The compound muscle action potentials of the right axillary nerve and right musculocutaneous nerves are *Page 21 
smaller than the comparison on the left as above. In the face of normal needle EMG and normal sensory amplitudes (with reference to the musculocutaneous nerve) this likely represents manifestations of disuse atrophy, noted clinically (and in the case of the axillary, an element of deltoid muscle "sacrifice" needed for the open rotator cuff repair) rather than neuropathy.
 {¶ 51} 30. According to the minutes of the March 20, 2007 meeting of the HWD committee, it voted to recommend to the board the denial of reconsideration of relator's application.
 {¶ 52} 31. According to the minutes of the April 26, 2007 meeting of the board, the board voted to deny relator's request for reconsideration of her application.
 {¶ 53} 32. On June 18, 2007, relator, Megan Worthy, filed this mandamus action.
Conclusions of Law: {¶ 54} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 55} R.C. 550[5]. 18(A) provides:
 Upon the application of a member of the state highway patrol retirement system * * * a member who becomes totally and permanently incapacitated for duty in the employ of the state highway patrol may be retired by the board.
 The medical or psychological examination of a member who has applied for disability retirement shall be conducted by a competent health-care professional or professionals appointed by the board. The health-care professional or professionals shall file a written report with the board containing the following information:
 (1) Whether the member is totally incapacitated for duty in the employ of the patrol;
 (2) Whether the incapacity is expected to be permanent; *Page 22 
 (3) The cause of the member's incapacity.
 The board shall determine whether the member qualifies for disability retirement and its decision shall be final. The board shall consider the written medical or psychological report, opinions, statements, and other competent evidence in making its determination. * * *
 {¶ 56} R.C. 550[5]. 18(B)(2) provides:
 Except as provided under division (B) of section 5505.58 of the Revised Code, a member whose retirement on account of disability incurred not in the line of duty shall receive the applicable pension provided for in section 5505.17 of the Revised Code[.] * * *
 {¶ 57} R.C. 550[5]. 18(D) provides:
 A member placed on a disability pension who has not attained the age of sixty years shall be subject to an annual medical or psychological re-examination by health-care professionals appointed by the board, except that the board may waive the re-examination if the board's health-care professionals certify that the member's disability is ongoing.* * *
 {¶ 58} R.C. 5505.01 provides the following definitions:
 (K) "Retirant" means any member who retires with a pension payable from the retirement system.
 * * *
 (N) "Pension" means an annual amount payable by the retirement system throughout the life of a person or as otherwise provided in the plan.
 * * *
 (Q) "Retirement" means termination as an employee of the state highway patrol, with application having been made to the system for a pension or a deferred pension. *Page 23 
 {¶ 59} Mandamus is the appropriate remedy for relator to seek relief from OSHPRS's denial of her application for disability retirement benefits because R.C. 550[5].18 does not provide for an appeal from the board's decision on her application. State ex rel. Grein v. Ohio StateHwy. Patrol Retirement Sys., 116 Ohio St.3d 344, 2007-Ohio-6667, at ¶ 6, citing State ex rel. Moss v. Ohio State Hwy. Patrol RetirementSys., 97 Ohio St.3d 198, 2002-Ohio-5806, at ¶ 6.
 {¶ 60} As long as there is "sufficient evidence" to support the board's decisions, the courts will not disturb them. Grein, at ¶ 9.
 DR. BLOOD'S REPORTS {¶ 61} Dr. Blood was appointed by the board pursuant to R.C. 550[5].18(A) to be its "competent health-care professional" regarding relator's application. Under that statute, Dr. Blood was required to file a written report with the board containing the information specified under the statute.
 {¶ 62} As previously noted, on August 11, 2006, Dr. Blood examined relator pursuant to his board appointment. In his narrative report of that date, Dr. Blood concludes:
 * * * My concern is the physical findings with significant swelling in the shoulder, her decreased range of motion, and pain that is reported with range of motion. Again, the main objective finding is the significant swelling in her proximal right arm. Because her job requires her to operate a motor vehicle at high rates of speed and also be able to respond in emergency situations aiding victims in automobile accidents or using firearms or unarmed self-defense techniques, unfortunately that would place significant stress on her dominant right arm. It appears that she not only has pronounced subjective complaints but does have objective findings with measurable swelling in her proximal arm. I feel that this would restrict her abilities to safely perform her duties as a State Highway Patrol Trooper. I did feel that this *Page 24 
should be considered permanent in that there is no clear identifiable reason yet discovered for her ongoing pain and the swelling that was noted today. I feel she should be re-evaluated in a year.
 {¶ 63} As previously noted, on August 11, 2006, Dr. Blood completed OSHPRS's attending physician's form. He did not mark the first box aside the pre-printed language indicating that the applicant is "TOTALLY INCAPACITATED * * * and that such incapacitation is permanent." (Emphasis sic.) Instead, Dr. Blood marked the second box aside the pre-printed language "TOTALLY INCAPACITATED * * * at this time but could return to work at sometime in the foreseeable future." (Emphasis sic.) Where the form invites the doctor to provide an estimated return-to-work date, Dr. Blood wrote "one year (re-evaluate)."
 {¶ 64} Here, citing R.C. 5505.18(D)'s provision for an annual medical re-examination for a member placed on a disability pension, relator argues that Dr. Blood did not intend to opine that relator can return to work as a trooper within one year of the evaluation, nor did he intend to opine that the incapacitation was not permanent. According to relator, Dr. Blood was only indicating that relator should be re-evaluated in one year, as the statute permits. (Reply brief, at 3.) Relator further argues that the statute, R.C. 5508.18, must be read to define "permanent" as total incapacitation lasting at least one year. Thus, relator argues that even if Dr. Blood meant to opine that the incapacitation could be expected to last one year, that would meet the definition of "permanent."
 {¶ 65} According to respondent, it was Dr. Blood's opinion that relator was currently incapacitated but not permanently so. (Respondent's brief, at 4, 10.) Respondent's position is based upon the fact that Dr. Blood marked the second box *Page 25 
indicating that relator "could return to work at sometime in the foreseeable future." Respondent also points to statements Dr. Blood made in his narrative report. For example, Dr. Blood stated that relator "would [not] be significantly limited after her rotator cuff repair." He further stated that the cervical strain does not offer her "significant restrictions either."
 {¶ 66} However, respondent fails to explain how it can be said that it was Dr. Blood's opinion that relator's incapacitation is not permanent when he states in his narrative report: "I did feel that this should be considered permanent in that there is no clear identifiable reason yet discovered for her ongoing pain and the swelling that was noted today. I feel she should be re-evaluated in a year."
 {¶ 67} Unfortunately, R.C. Chapter 5505, which governs OSHPRS, does not define the meaning of "permanent" as that term is used at R.C.5505.18(A) which provides for a retirement benefit for a member "who becomes totally and permanently incapacitated for duty in the employ of the state highway patrol."
 {¶ 68} Thus, R.C. Chapter 5505 is unlike R.C. Chapter 3307, which governs the State Teachers Retirement System ("STRS"). A member of STRS who is mentally and/or physically incapacitated for the performance of duty by a disabling condition qualifies for disability retirement if the condition is either "permanent or presumably permanent for twelve continuous months following the filing of an application." R.C.3307.62(C).
 {¶ 69} R.C. Chapter 5505 at issue here does not provide for presumptive permanency based on 12 continuous months of incapacitation as does R.C. Chapter 3307. See, also, R.C. 3309.39(C) which provides for presumptive permanency based *Page 26 
upon 12 continuous months of incapacitation for a member of the School Employees Retirement System ("SERS").
 {¶ 70} Given that R.C. Chapter 5505 does not specifically provide for presumptive permanency, this magistrate is reluctant to incorporate that concept into R.C. Chapter 5505 simply because the concept appears in the statutes governing STRS and SERS.
 {¶ 71} Dr. Blood's reports are ambiguous on the critical question of permanency. While the term "permanent" remains statutorily undefined, Dr. Blood nevertheless opined in his narrative report that relator's current inability to safely perform her duties as a trooper "should be considered permanent." Despite his narrative statement, on the attending physician form, Dr. Blood did not mark the first box aside the pre-printed statement that the incapacitation is permanent. Instead, Dr. Blood marked the second box which presumably is intended for use when the doctor believes that the incapacitation is not permanent. Thus, Dr. Blood's selection of the second box over the first box is inconsistent with his narrative statement that incapacitation is permanent.
 {¶ 72} Moreover, writing "one year (re-evaluate)" where the form invites him to provide an estimated return-to-work date does not resolve the ambiguity. Dr. Blood's handwritten statement can be read to mean that relator will be incapacitated for one year or that she should be re-evaluated in one year, or perhaps both. Moreover, if the statement is read to mean that relator will be incapacitated for one year, it can be argued that a one-year incapacitation was not viewed to be a permanent incapacitation because Dr. Blood selected the second box rather than the first box. *Page 27 
 {¶ 73} In short, this magistrate concludes, based upon the above analysis, that Dr. Blood's reports are equivocal on the critical question of the permanency of the incapacitation.
 {¶ 74} Equivocal medical opinions are not evidence. State ex rel.Eberhardt v. Flxible Corp. (1994), 70 Ohio St.3d 649, 657. Equivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement. Id. Ambiguous statements, however, are equivocal only while they are unclarified. Id.
 {¶ 75} In the magistrate's view, the equivocal nature of Dr. Blood's reports could conceivably be clarified by Dr. Blood so that they are no longer ambiguous. Here, the attending physician form itself may have contributed to Dr. Blood's ambiguous statements.
 {¶ 76} Ambiguous statements merely reveal that the doctor did not effectively convey what he meant and, therefore, they are not inherently unreliable. Id.
 {¶ 77} Under R.C. 550[5]. 18(A), respondent had a clear legal duty to provide a medical examination to be conducted by a competent health care professional, and the health care professional had a clear legal duty to file a written report with the board.
 {¶ 78} Given that Dr. Blood's written reports are equivocal, until such time as he is able to clarify the ambiguity, respondent has effectively failed to provide for the medical examination and the written report that R.C. 5508.18(A) requires.
 DR. METZ'S MEMORANDA *Page 28 {¶ 79} In his December 12, 2006 letter or report to Dr. Metz, Dr. Blood addressed the November 27, 2006 MRI of the cervical spine and compared it to the July 15, 2005 MRI. Dr. Blood concludes:
 * * * It appears that although those two studies were performed more than a year apart by different radiologists, the wording is very similar and it appears on the description based on the two MRI reports that there has been no interval change despite the history of the automobile accident. I do not feel based on this information that there is need for an additional examination.
 {¶ 80} Apparently referring to Dr. Blood's December 12, 2006 letter or report, on January 3, 2007, Dr. Metz wrote:
 * * * Dr. Blood reviewed all of the information, including the fact that there were essentially no changes in the cervical MRI and concluded that there was no reason to change his previous decision that Megan Worthy was capable of continuing her job as a trooper.
 {¶ 81} Given the ambiguity in Dr. Blood's reports, as analyzed above, Dr. Metz's January 3, 2007 characterization of Dr. Blood's "previous decision" is problematical. As indicated above, it is not at all clear that Dr. Blood had opined that relator "was capable of continuing her job as a trooper," to quote the words of Dr. Metz. Moreover, Dr. Metz had no authority to interpret or resolve the ambiguity. Only Dr. Blood can clarify his ambiguous reports. Eberhardt; State ex rel. Petronio v.Indus. Comm. (1999), 84 Ohio St.3d 427 (the Eberhardt rule required the commission to accept Dr. Muehrcke's explanation of his conflicting reports notwithstanding the commission's authority to determine credibility). *Page 29 
 {¶ 82} Accordingly, to the extent that the board may have been persuaded by Dr. Metz's January 3, 2007 memorandum, relator can claim prejudice as to respondent's decision making.
 {¶ 83} In his March 6, 2007 memorandum, Dr. Metz presents his analysis of the medical evidence of record as it relates to the application. However, he makes no mention of Dr. Blood's reports. His final memorandum concludes:
 After a long time and several exams and diagnostic studies, we are left with only the subjective symptom of pain in the right shoulder and arm with no objective data to explain the pain described by Ms. Worthy.
 {¶ 84} Perhaps it can be argued that the board was persuaded to deny the application by Dr. Metz's March 6, 2007 memorandum and, thus, Dr. Blood's reports did not matter in the final analysis.
 {¶ 85} However, respondent, through counsel, strongly suggests here that Dr. Metz's March 6, 2007 memorandum was relied upon by the board. (Respondent's brief, at 11-12.) Based in part on Dr. Metz's analysis, respondent concludes here:
 * * * The medical records indicated to the Board that there were no objective medical reasons for her claimed disability, only her subjective complaint of pain and weakness in her shoulder.
Id. at 12.
 {¶ 86} Significantly, respondent also asserts here:
 * * * The Board is not obligated to accept the reports of Drs. Castor, Unverferth, and Grant over the opinion of Dr. Blood who indicated Ms. Worthy was not permanently incapacitated, or the voluminous medical records that could not establish an objective cause for Ms. Worthy's reported shoulder pain and weakness, and the opinion of its medical consultant, Dr. Metz. * * * *Page 30 
Id. at 12-13.
 {¶ 87} Thus, in this action, respondent, through counsel, concedes that Dr. Blood's reports were a factor in the board's decision.
 {¶ 88} Given that Dr. Blood's reports were a factor in the board's decision to deny the application, or, at least, that it cannot be conclusively ruled out that the reports were a factor, this magistrate must conclude that the unresolved equivocation in Dr. Blood's reports on the critical issue of permanency requires this court to issue a writ of mandamus that requires respondent to seek clarification from Dr. Blood regarding the conflict in his reports. See State ex rel. Columbia-CSA/HSGreater Canton Area Sys. v. Indus. Comm., Franklin App. No. 02AP-703, 2003-Ohio-2189 (this court issued a writ of mandamus ordering the commission to vacate its order denying permanent total disability compensation, to permit the parties to obtain clarification of Dr. Nafziger's report, and to thereafter enter an amended order adjudicating the permanent total disability application).
 {¶ 89} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent to vacate its decision denying relator's application for a disability pension, to seek written clarification from Dr. Blood in order to resolve the ambiguity in his reports and, thereafter, to enter a new decision regarding relator's application. *Page 1