[Cite as *State ex rel. Smith v. Ohio Pub. Emps. Retirement Sys.*, 2016-Ohio-2731.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State of Ohio ex rel. Donna J. Smith, | : | |
| Relator, | : | |
| v. | : | No. 14AP-1060 |
| Ohio Public Employee[s] Retirement System, | : | (REGULAR CALENDAR) |
| Respondent. | : | |

D E C I S I O N

Rendered on April 28, 2016

**On Brief:** *The Bainbridge Firm, LLC,* and *Carol L. Herdman,* for relator.

**On Brief:** *Michael DeWine*, Attorney General, *John J. Danish* and *Mary Therese Bridge,* for respondent.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

TYACK, J.

{¶ 1} Donna J. Smith filed this action in mandamus seeking a writ to compel the Ohio Public Employees Retirement System ("OPERS") to grant her application for a disability benefit.

{¶ 2} In accord with Loc.R. 13 of the Tenth District Court of Appeals, the case was referred to a magistrate to conduct appropriate proceedings. The parties stipulated the pertinent evidence and filed briefs. The magistrate then issued a magistrate's decision, appended hereto, which contains detailed findings of fact and conclusions of law. The magistrate's decision includes a recommendation that we deny the request for a writ.

{¶ 3} Counsel for Donna Smith has filed objections to the magistrate's decision. Counsel for OPERS has filed a memorandum in response. The case is now before the court for a full independent review.

{¶ 4} Donna Smith was a licensed practical nurse at Gallipolis Development Center. She was attacked by a client at the development center. She claims neck and arm pain following the attack. A few months later, her employment ended. Two years later, she applied for disability benefits.

{¶ 5} As a result of the filing of the application, she was referred for an independent medical evaluation by Arthur L. Hughes, M.D. Dr. Hughes issued a report which indicated that he saw no objective evidence to support Smith's claims of neck and arm pain. Dr. Hughes' report presents the main point of contention at this point according to counsel for Smith.

{¶ 6} Other medical practitioners also reviewed the medical and psychiatric condition of Donna Smith and concluded that she was not entitled to a disability benefit.

{¶ 7} If some evidence supports the decision of the OPERS board, then we are supposed to leave that decision in place. *See State ex rel. Marchians v. School Emp. Ret. Sys.,* 121 Ohio St.3d 139, 2009-Ohio-307, for the standard in a similar retirement system.

{¶ 8} Dr. Hughes acknowledged the existence of neck and arm pain in Donna Smith, but claims at one point in his report that he could not find an objective basis for it. He views Smith's claim of pain as not being disabling as of the date of his examination. At the same time, he reported that he found an absence of left triceps reflex and diminished sensation of the left third and fourth fingers. These findings could be deemed to be objective indications of nerve abnormalities, making the report of Dr. Hughes possibly ambivalent.

{¶ 9} The findings of Dr. Hughes with respect to diminished sensation in the left third and fourth fingers could reasonably be viewed as evidence of numbness, not of pain.

{¶ 10} Without further explanations from a medical professional, we cannot say the absence of a left triceps reflex is an objective demonstration of pain, as opposed to other nerve responses.

{¶ 11} Reports submitted to OPERS also indicate that Smith was suffering from depression and anxiety. The reports conflicted as to whether these emotional problems were work disabling.

{¶ 12} Our magistrate viewed the report of Dr. Hughes as flawed, but not so flawed as to remove it from all evidentiary consideration. We agree, as discussed above.

{¶ 13} As noted earlier, if some evidence supports the decision of OPERS, we are not permitted to overturn it. The evidence as to psychological disability was clearly contradictory. OPERS was clearly at liberty to chose among the conflicting conclusions as to a disability based upon psychological conditions.

{¶ 14} As to physical disability, evidence existed to support the ultimate finding by OPERS.

{¶ 15} As a result of the above, we overrule the objections to the magistrate's decision. We adopt the findings of fact and conclusions of law in the magistrate's decision and deny the request for a writ of mandamus.

*Objections overruled; writ denied.*

BROWN and KLATT, JJ., concur.

———————————

# A P P E N D I X

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

The State of Ohio ex rel. Donna J. Smith,    :

      Relator,    :

v.    :    No. 14AP-1060

Ohio Public Employee[s] Retirement    :    (REGULAR CALENDAR)
System,

      Respondent.    :

---

M A G I S T R A T E ' S   D E C I S I O N

Rendered on February 18, 2016

---

*The Bainbridge Firm, LLC, Carol L. Herdman, Andrew J. Bainbridge, Christopher J. Yeager* and *Zachary L. Tidaback,* for relator.

*Michael DeWine*, Attorney General, *John J. Danish* and *Mary Therese Bridge,* for respondent.

---

IN MANDAMUS

{¶ 16} In this original action, relator, Donna J. Smith, requests a writ of mandamus ordering respondent, Ohio Public Employees Retirement System ("OPERS"), to vacate its September 17, 2014 decision denying relator's application for a disability benefit, and to enter a decision granting a disability benefit.

Findings of Fact:

{¶ 17} 1. On April 19, 2008, while employed as a licensed practical nurse ("LPN"), at the Gallipolis Development Center, relator was attacked by a client while sitting at her desk. The client grabbed her hair and pulled her to the floor. Relator continued working but complained of neck and arm pain after the incident.

{¶ 18} 2. Effective September 30, 2011, relator was involuntarily separated from her employment at the Gallipolis Development Center. The employer stated that the reason for the separation is that relator: "is unable to perform the essential job duties of his/her position due to a disabling illness, injury or condition."

{¶ 19} 3. On June 27, 2013, relator filed a disability benefit application on a form provided by OPERS.

{¶ 20} 4. On her application, relator stated that she has daily neck pain that radiates into her left arm, that her left arm is weak, and she has difficulty lifting even a gallon of milk. She has trouble gripping and will drop things. She has numbness in the fingers on her left hand. She is left hand dominant. She cannot grip pills and other small things with her left hand. Relator further stated that she suffers from depression and anxiety. She fears returning to work. She does not sleep well and has trouble concentrating.

{¶ 21} 5. Earlier, on May 2, 2013, at the request of the Ohio Bureau of Workers' Compensation ("bureau"), relator was examined by James R. Hawkins, M.D., who specializes in psychiatry and neurology. In his nine-page narrative report dated May 9, 2013, Dr. Hawkins noted that relator was seeking an additional claim allowance for an April 19, 2008 industrial injury. Dr. Hawkins diagnosed: "Depressive Disorder NOS" and "Generalized Anxiety Disorder." He opined that the workplace injury of April 19, 2008 caused the psychiatric conditions.

{¶ 22} 6. On November 13, 2013, at the request of OPERS, relator was examined by Arthur L. Hughes, M.D., who specializes in neurology. In his five-page narrative report dated November 15, 2013, Dr. Hughes states:

> HISTORY AS DESCRIBED BY MS. SMITH:
>
> * * *
>
> She is not receiving treatment now, aside from massage therapy. She continues to have neck pain, extending into the head and down the left arm, into the hand. She continues to have neck pain, extending into the head and down the left arm, in to the hand. The fingers tingle if the temperature is less than 50 degrees. The left third and fourth fingers are numb. She drops things with the left hand. She has neck pain when she sneezes. She believes that she is getting worse.

* * *

PHYSICAL EXAMINATION:

On examination today she is a depressed appearing, intermittently tearful lady, who is 5'9" tall, weighing 185 pounds. She is left handed. She can flex the neck to 40°, extend to 40°, laterally bend to the right 15° and to the left 25° and she can rotate to the right 25° and to the left 40°. Spurling's sign is negative bilaterally. Muscle strength is normal in the upper and lower extremities. Biceps reflexes are 1+, triceps reflexes are 2+ on the right and absent on the left. Knee and ankle reflexes are 1+ and the plantar responses are flexor. There is diminished light touch sensation affecting the left third and fourth fingers on the ulnar aspect of the forearm. Her gait is unremarkable.

REVIEW OF MEDICAL RECORDS:

All information provided in the disability claim file was reviewed and considered for this report, including the following:

* * *

X-rays of the cervical spine show no abnormality and the dorsal spine shows mild, degenerative osteoarthritis and the lumbar spine, same date shows mild, degenerative osteoarthritis.

MRI scan of the cervical spine, 12/28/09 shows a tiny protrusion C2-3 and C4-5, small protrusion at C3-4.

EMG of the upper extremities, 9/22/10 shows mild, chronic denervation in the left deltoid and supraspinatus muscles.

EMG of the upper extremities, 9/29/11 is normal.

A cervical MRI 7/1/11 shows small protrusion at C4-5 and C5-6 and disc desiccation and degeneration at C2-3, C3-4, C4-5 and C5-6.

* * *

An EMG of the upper extremities, 12/11/12 is normal.

* * *

An MRI scan of the left shoulder, 1/4/13, shows rotator cuff tendinosis of the supraspinatus and infraspinatus tendons with partial bursal surface tear.

* * *

OPINIONS AND COMMENTS:

Ms. Smith experienced a neck injury on 4/19/08 and continued working with pain in the neck and left arm until 7/28/11. The cause of her pain has been uncertain, as has been described by her physicians. The pain was thought to be radicular, but possible reflex sympathetic dystrophy has also been discussed. Her physicians have not described any of the typical findings in reflex sympathetic dystrophy, however. She has become depressed. Her examination today discloses no typical manifestations of reflex sympathetic dystrophy, including color change, temperature change, atrophy of skin and nails, change in hair, pain, and restricted range of motion of associated joints and allodynia.

The findings on multiple MRI scans are of an ordinary age-related nature and on the two most recent EMGs were negative. The cause of her ongoing neck and left arm pain is unclear in so far as history and physical findings, MRI imaging and electromygraphical studies are concerned. Nonetheless, she has continued to have pain, which has restricted her daily activities.

OPERS DEFINITION OF PERMANENT DISABILITY

Mentally or physically incapacitated for the performance of duty, in claimant's own occupation, by a disabling conditions [sic], either permanent or presumed permanent. A disability is presumed to be permanent if it is expected to last for a continuous period of at least twelve months.

Issue #1: Per OPERS definition of permanent disability (defined above), is the claimant presumably disabled for the performance of her own occupation as a public employee, Licensed Practical Nurse?

Response: I have reviewed the OPERS definition of permanent disability, and although she has had prolonged neck and left arm pain, as there are no objective

abnormalities, she cannot be considered permanently disabled for the performance of her occupation as a licensed practical nurse. The examination revealed only her self-reported symptoms; there are no confirmatory abnormalities on test results noted in the records or in the office notes of Dr. Bansal.

Issue #2: Do you anticipate a clinically significant change in the claimant's disabling condition within the next twelve months?

Response: Based on my examination, and the medical notes reviewed, I do not anticipate a clinically significant change in the patient's condition within the next 12 months.

Issue #3: What is the claimant's current disabling diagnosis?

Response: The claimant's current diagnosis is neck and left arm pain of uncertain cause. However the diagnosis is not disabling at this time.

Issue #4: If there is objective medical evidence to support disability, please comment on expected treatment, duration and prognosis.

Response: There is no objective medical evidence to support disability. The diagnosis is based on the patient's self-reported complaints of neck and left arm pain, which have been consistent over an extended period of time. Treatment at this point is symptomatic and could include non-narcotic medication, physical therapy and self-directed neck exercise. Due to the extended time that she has had the neck and left arm complaints, and the medical history via her physicians, her prognosis is poor for improvement.

* * *

Issue #6: Do the claimant's subjective complaints/symptoms correlate with your objective clinical findings?

Response: The claimant's subjective complaints and symptoms correlate with my objective, clinical findings (absence of left triceps reflex and diminished sensation of the left third and fourth fingers).

{¶ 23} 7. The report of Dr. Hughes as well as other information contained in the OPERS disability claim file was reviewed by the Managed Medical Review Organization ("MMRO") at the request of OPERS. On December 5, 2013, MMRO issued a report recommending denial of the requested disability benefits.

{¶ 24} 8. On December 10, 2013, OPERS medical advisor, Maurice Mast, M.D., reviewed the MMRO recommendation. He recommended that relator's disability application be denied.

{¶ 25} 9. At the December 18, 2013 meeting, the OPERS board voted to deny the disability application.

{¶ 26} 10. By letter dated December 19, 2013, OPERS notified relator that the OPERS board had denied her disability benefit application.

{¶ 27} 11. Also by letter dated December 19, 2013, OPERS informed relator that she had the right to appeal the board's denial of her application. The letter informed relator that the appeal should be supported by "additional objective medical evidence, at your expense."

{¶ 28} 12. On January 3, 2014, relator, through counsel, submitted an OPERS "Disability Benefits Appeal Request Form."

{¶ 29} 13. In support of her appeal, relator's counsel submitted a three-page letter dated April 10, 2014 that discusses the medical evidence of record supporting the application.

{¶ 30} 14. On February 11, 2014, at relator's own request, she was evaluated by psychologist, Scott Lewis Donaldson, Ph.D. In his eight-page narrative report, Dr. Donaldson opines:

> Based upon Ms. Smith's emotional status as well as psychological components of chronic pain and orthopedic limitations, in this examiner's opinion, it is unrealistic to presume that she will return to her former position as an LPN at the Gallipolis Developmental Center. Once symptoms of Ms. Smith's depressive and anxiety disorders have been ameliorated, gainful employment in a setting that does not pose a significant risk to her safety and well-being may be a consideration.

{¶ 31} 15. On July 10, 2014, at the request of OPERS, relator was examined by Dr. Hawkins, who had previously examined on May 2, 2013, at the request of the bureau. In his 11-page narrative report dated July 21, 2014, Dr. Hawkins states:

> On examination, she presented as mildly depressed and anxious, but with very little psychomotor retardation, in fact, she became more animated as the interview progressed. There were no memory impairments. I did feel she was exaggerating her symptoms, and in fact, gave approximate answers to the questions of recalling three objects at three minutes and spelling WORLD backwards.
>
> Functionally, she is living at home and reports not doing much in the way of household chores. She has developed a sedentary life. She can get out some, but is reporting that she is anxious frequently. She does continue to pay the household bills, enjoys reading, attends church and watches TV.
>
> In short, she has mild depressive and anxiety symptoms that do not appear to be work prohibiting.

(Emphasis sic.)

{¶ 32} 16. In his report dated July 21, 2014, Dr. Hawkins answers questions posed by OPERS:

> **[One] Per OPERS definition of permanent disability (defined above), is claimant presumably permanently disabled for the performance of their [sic] own occupation as a public employee, Licensed Practical Nurse? If yes, please provide supporting rationale.**
>
> Based on my examination findings and review of the medical records, Ms. Smith does meet DSM-IV criteria for depressive disorder NOS and an anxiety disorder NOS. Both of these conditions are mild in nature and are not work prohibitive. In my opinion the claimant is not presumably permanently disabled for the performance of her own occupation as a public employee. There is no indication that her emotional condition would preclude her from passing medication, teaching about medications and providing appropriate documentation.
>
> * * *

**[Four] What is the claimant's current disabling diagnosis(es)? If none exists, please indicate in your response.**

At this time I do not find any disabling diagnoses.

* * *

**[Seven] Do the claimant's subjective complaints/symptoms correlate with your objective clinical findings? If no, please explain.**

Subjectively, she is complaining of severe anxiety and depression. Objectively, she tended to exaggerate her symptoms. Symptoms of anxiety and depression were mild in nature. They do not preclude her from working.

**[Eight] Do your observed activities/behavior of the claimant correlate with your objective clinical findings? If no, please explain.**

I observed her to be mildly anxious and tearful during the interview. Objectively, she tended to exaggerate her symptoms. From a functional standpoint, her psychological symptoms are not impairing.

{¶ 33} 17. On July 24, 2014, at the request of OPERS, relator was examined by Eugene Lin, M.D., who specializes in physical medicine and rehabilitation. In his eight-page narrative report, Dr. Lin states:

**HISTORY OF PRESENT CONDITION:** The claimant reports diffuse pain complaints. These pain complaints involve the neck with pain currently radiating down the **right** arm. She states numbness and tingling in both upper extremities and both lower extremities. She reports decreased grip strength in the bilateral hands. She also reports back pain and left lower extremity pain.

She attributes these pain complaints to an event that occurred on 04/19/2008. On this date, a client grabbed her hair and they both fell to the ground. She reported neck pain and shoulder tightness on the left side (opposite side to her current complaints) as well as reporting bilateral abrasions of the knee.

The claimant has had treatment with Dr. Karr for a Workers' Compensation claim, Dr. Towpenny for general medical follow-up and multiple specialty consultations. She has had multiple electrodiagnostic studies, which initially stated mild chronic findings suggested of a left C5-6 radiculopathy in 2010. However, repeat EMGs after that date show that the left C5-6 radiculopathy had resolved.

The claimant has had multiple imaging studies of the cervical spine, lumbar spine, and left shoulder. These MRIs were all stated to show diffuse nonfocal degenerative changes.

The multiple physical examinations, within the medical record, show no consistent focal findings attributable to a cervical or lumbar radiculopathy. * * *

**PHYSICAL EXAMINATION:** The claimant is in no acute distress. She is cooperative during the interview and physical examination. The claimant has a compression sleeve on her right upper extremity. She gestured freely with her left upper extremity.

She has good sitting tolerance. She has good transfers from sitting to standing. She is able to go from lying to sitting with a sit-up maneuver. She has normal gait with good heel-to-toe motion.

Manual muscle testing shows give-way weakness over bilateral lower extremities and bilateral upper extremities incompatible with the claimant's ability to adjust to carry a large purse in her left hand and ambulate.

Range of motion of the neck shows self-restricted range of motion. There is 50 degrees of extension, 60 degrees of forward flexion, and 40 degrees of side bending. Please note, that these ranges of motion are decreased compared with observed range of motion during the interview. During the interview, she has full and unrestricted range of motion that appeared pain-free and smooth.

There is tenderness to palpation diffusely over the right neck and shoulder that did not change between light and deep palpation. Spurling's sign is negative for radicular symptoms.

There is decreased range of motion of the right shoulder with 90 degrees of forward flexion and abduction. Left shoulder shows 130 degrees of forward flexion and 90 degrees of

forward flexion and abduction. Left shoulder shows 130 degrees of forward flexion and 0 degrees of abduction. Range of motion of the shoulders show improvement to 150 degrees of flexion and abduction on the left with retry. Please note, that the claimant has significantly better range of motion in both shoulders during the interview process and the claimant is able to tolerate carrying a large purse with her left upper extremity as she left the interview.

Range of motion of the lumbar spine shows 90 degrees of forward flexion, 30 degrees of side bending and 40 degrees of extension. There is no tenderness to palpation over the lumbar spine. Straight leg raises are bilaterally negative.

Please note, that there are multiple signs of symptom magnification and inconsistency of physical findings on this examination. These would include self-restriction to range of motion of the neck and shoulder inconsistent with ranges of motion observed in interview. There is diffuse give-way weakness over bilateral lower extremities and upper extremities inconsistent with the claimant's ability to ambulate and carry the objects that she brought into the examination. There are diffuse regional complaints of pain over the entire body (the claimant had put cross marks over the entire upper half of the pain chart as well as both knees and both feet).

Please also note, that the claimant's current subjective complaints and self-restriction in range of motion are predominantly of the right upper extremity. This is not consistent with the medical records, which stated subjective complaints predominantly over the left upper extremity.

**MEDICAL RECORDS REVIEWED:** All information provided in the disability claim file was reviewed.

* * *

X-ray of the lumbar spine 08/08/2008. This showed mild degenerative arthritis of the thoracic spine. There was mild degenerative osteoarthritis of the lumbar spine and spondylolysis at L5.

12/28/2009, MRI of the cervical spine. This showed a tiny disc protrusion at C2-3 and C4-5. At C3-4 and C5-6, there is a small disc protrusion. At C5-6, there was a tiny disc protrusion with leftward predominance.

MRI of the lumbar spine dated 12/29/2009. This showed no disc bulge or herniation. There is dehydration of intervertebral discs diffusely. There was no evidence of lumbar canal stenosis or foraminal stenosis.

X-ray of the left forearm dated 11/19/2010. This was an unremarkable study.

09/22/2010, EMG with Dr. Lewis. Dr. Lewis stated there were mild chronic changes over the left deltoid and left supraspinatus muscle. These were suggestive of a chronic left C5-6 radiculopathy. There were no pathological changes in the nerve conduction study of the right upper extremity. There was no EMG of the right upper extremity.

07/01/2011, MRI of the cervical spine. This showed small central disc protrusion at C4-5 and C5-6 with mild canal impingement and no significant foraminal narrowing. There was disc desiccation diffusely from C2 through C6.

* * *

09/29/2011, EMG with Dr. Bradford: Dr. Bradford performed a study of the left upper extremity. Dr. Bradford stated that there was no evidence of electrodiagnostic pathology on either the nerve conduction study or the needle EMG.

* * *

On 09/19/2012, there was an MRI of the brain. This showed no intracranial pathology.

12/11/2012 electrodiagnostic study with Dr. Ferimer. Dr. Ferimer performed a bilateral nerve conduction study. This study was normal he performed an EMG (needle study) of left upper extremity. This was also normal.

* * *

01/04/2013, MRI of the left shoulder. This showed rotator cuff tendinosis (chronic tendinopathic changes) over the supraspinatus and infraspinatus. There is a partial-thickness surface tear of the distal fibrous of the supraspinatus. This was read as a small tear.

\* \* \*

**CONCLUSIONS:** Ms. Smith is a 44-year-old left hand dominant female. Currently, she reports diffuse pain complaints over the entire upper half of her body, as well as bilateral knees and bilateral ankles. Her subjective complaints are out of proportion with her objective findings both on my current examination and within the medical records. It is also important to note that the medical record predominantly shows left upper extremity symptoms, while the claimant's current presentation showed predominantly right upper extremity findings. This would be an inconsistent presentation.

Please also note, that there were multiple signs of symptom magnification on her physical examination.

Alleged conditions of permanent disability, displaced cervical disc, left arm pain, neck pain, left leg weakness, left arm weakness, anxiety. Ineligible diagnoses abrasion hip/leg, sprain/strain neck.

[One] Per OPERS definition of permanent disability, is the claimant presumably permanently disabled from the performance of her own occupation as the public employee, licensed practical nurse? If yes, please provide supporting rationale.

There is insufficient objective evidence to state that the claimant would be permanently disabled from performance of her own occupation as a public employee (licensed practical nurse). Review of the medical records showed diffuse subjective complaints regarding the neck and left upper extremity, which were not consistent with her current subjective presentation (neck and right upper extremity complaints). In addition, there were multiple electrodiagnostic studies, which showed no electrodiagnostic evidence of central or peripheral neuropathic conditions. Multiple imaging studies, which showed no significant focal musculoskeletal or discogenic pathologies and physical examination, which showed diffuse findings. In fact, her treating physicians had stated that they were unable to definitively state the causes of her subjective complaints.

Thus, there is insufficient evidence that the claimant meets the OPERS definition of permanent disability.

[Two] Do you anticipate a clinically significant change in the claimant's disabling conditions within the next 12 months?

Currently, the claimant has multiple inconsistent subjective complaints of pain (the medical records state that her complaints were predominantly left-sided; however current presentation states the findings were right-sided). The claimant has evidence of symptom magnification and inconsistent physical examination. I do not expect a change in the claimant's subjective complaints within the next 12 months.

[Three] What are the claimant's current disabling diagnoses?

There is insufficient evidence, within the medical record, to support any condition as being disabling. Please note that the claimant has multiple subjective complaints, nonfocal inconsistent objective physical examination findings, and multiple signs of symptom magnification.

* * *

[Six] Do the claimant's subjective complaints/symptoms correlate with her objective clinical findings?

No, the claimant's subjective complaints are out of proportion with her objective clinical findings. Her physical examination showed inconsistent ranges of motion between her observed ranges of motion during interview versus those of direct physical examination. Her current subjective complaints are contralateral (opposite) with those within the medical records. Thus, the claimant's subjective complaints/symptoms do not correlate with objective clinical findings.

[Seven] Do you observe activities/behavior of the claimant that correlate with their objective clinical findings?

No, the claimant's observed activities do not correlate with her self-restriction in range of motion and diffuse pain complaints, as well as generalized weakness observed on direct physical examination. The claimant was observed carrying a large purse with her left upper extremity. She had smooth range of motion of her neck during the interview process. She was able to gesture freely with her left upper extremity without restrictions. She was able to lateral flex and lean to the right side to move her purse from the right

side to left side with her right and left hands. She was able to fully abduct her left upper extremity x 2 to move her hair out of the way to examine them, so that the neck was able to be examined.

(Emphasis sic.)

{¶ 34} 18. On August 7, 2014, MMRO issued a report indicating that the July 10, 2014 report of Dr. Hawkins and the July 24, 2014 report of Dr. Lin had been reviewed.

{¶ 35} 19. MMRO recommended to OPERS that relator's application for a disability benefit be denied.

{¶ 36} 20. On August 19, 2014, OPERS medical advisor, Andrew Smith, M.D., recommended denial of relator's application for a disability benefit.

{¶ 37} 21. At its September 17, 2014 meeting, the OPERS board voted to uphold its prior denial of relator's application.

{¶ 38} 22. On December 23, 2014, relator, Donna J. Smith, filed this mandamus action.

Conclusions of Law:

{¶ 39} In her brief, under "Statement of the Issues Presented," relator sets forth three issues:

> Did the Ohio Public Employees Retirement System Board act unreasonably by ignoring objective medical findings that demonstrate that Donna J. Smith suffers from physical conditions that contribute to her disability?
>
> Did the Ohio Public Employee [sic] Retirement System Board act unreasonably by determining that Ms. Smith is not disabled, when in fact, her own employer has deemed her unable to perform her job functions?
>
> Did the Ohio Public Employee [sic] Retirement System Board act unreasonably by relying upon the inconsistent medical reports of Dr. Hawkins?

(Relator's Brief, 4.)

{¶ 40} " '[M]andamus is an appropriate remedy where no statutory right of appeal is available to correct an abuse of discretion by an administrative body.' " *State ex rel. Cydrus v. Ohio Public Emps. Retirements Sys.*, 127 Ohio St.3d 257, 2010-Ohio-5770, ¶ 12,

quoting *State ex rel. Pipoly v. State Teachers Retirement Sys.,* 95 Ohio St.3d 327, 2002-Ohio-2219, ¶ 14.

{¶ 41} A clear legal right to a writ of mandamus exists when an agency is found to have abused its discretion by entering a decision that is not supported by some evidence. *State ex rel. Schaengold v. Pub. Emp. Retirement Sys.,* 114 Ohio St.3d 147, 2007-Ohio-3760, ¶ 19; *State ex rel. Marchiano v. School Emps. Retirement Sys.,* 121 Ohio St.3d 139, 2009-Ohio-307, ¶ 20-21; *Kinsey v. Bd. of Trustees of Police & Firemen's Disability & Pension Fund of Ohio,* 49 Ohio St.3d 224, 225 (1990).

{¶ 42} Because there is no statutory provision that it do so, OPERS is not required to provide an explanation for its decision or cite to the evidence that supports its decision. *Cydrus* at ¶ 17. The lack of such statutory provision does not violate Ohio's separation-of-powers doctrine. *Id.* at ¶ 22-24. Also, the benefit recipient is not denied procedural due process when OPERS fails to identify the evidence it relied upon and to briefly explain its reasons for terminating the disability benefit. *Id.* at ¶ 25-27. Preliminarily, it can be observed that, with its December 18, 2013 initial decision and its September 17, 2014 final decision, the board chose not to specifically cite to the medical evidence supporting its decisions.

{¶ 43} However, immediately prior to its December 18, 2013 decision, at the request of OPERS, relator was examined by Dr. Hughes on November 13, 2013. In his five-page narrative report, Dr. Hughes opines that relator "cannot be considered permanently disabled for the performance of her occupation as a licensed practical nurse."

{¶ 44} As earlier noted, citing Dr. Hughes report, OPERS medical advisor, Dr. Mast, recommended that relator's application for a disability benefit be denied. Thus, reliance upon Dr. Hughes' report can be inferred.

{¶ 45} Thereafter, on February 11, 2014, at relator's own request, she was evaluated by psychologist, Dr. Donaldson, who issued a report in which he opined: "it is unrealistic to presume that she will return to her former position as an LPN at the Gallipolis Developmental Center."

{¶ 46} Submitting Dr. Donaldson's report, relator administratively appealed the board's December 18, 2013 decision.

{¶ 47} On July 10, 2014, at the request of OPERS, relator was examined by psychiatrist, Dr. Hawkins, who had previously examined on May 2, 2013, at the request of the bureau. In his 11-page narrative report dated July 21, 2014, Dr. Hawkins states:

{¶ 48} "[s]ymptoms of anxiety and depression were mild in nature. They do not preclude her from working." He also opined "claimant is not presumably permanently disabled for the performance of her own occupation as a public employee."

{¶ 49} On July 24, 2014, at the request of OPERS, relator was examined by Dr. Lin who opined: "[t]here is insufficient evidence that the claimant meets the OPERS definition of permanent disability."

{¶ 50} On August 19, 2014, OPERS medical advisor, Dr. Smith, recommended that the board uphold its previous denial of the application. At its September 17, 2014 meeting, the OPERS board voted to uphold its prior denial of the application.

{¶ 51} Based upon the above-described scenario, the board's reliance upon the July 10, 2014 report of Dr. Hawkins and the July 24, 2014 report of Dr. Lin is also inferred.

{¶ 52} In short, the board relied upon three reports, i.e., the reports of Drs. Hughes, Hawkins, and Lin.

{¶ 53} Here, relator argues for the evidentiary elimination of all three reports. It can be noted, however, that Dr. Hughes and Dr. Lin each examined for the physical conditions of the disability claim. Therefore, evidentiary elimination of Dr. Hughes' report does not necessarily require this court to issue a writ of mandamus.

### Dr. Hughes' Report

{¶ 54} As earlier noted, in her brief, under "Statement of the Issues Presented," relator sets forth three issues. The first issue asks whether OPERS acted "unreasonably by ignoring objective medical findings that demonstrate that [relator] suffers from physical conditions that contribute to her disability?" (Relator's Brief, 4.) Thus, relator asks for the evidentiary elimination of the reports of Drs. Hughes and Lin. Her brief states:

> In the instant matter, Dr. Hughes reviewed the diagnostic reports, recorded the abnormal findings, and acknowledged that his examination produced objective clinical findings consistent with these diagnoses, except for an absence of left

> triceps reflex and diminished sensation of the left third and fourth fingers. * * * Then, contrary to his own prior statements, Dr. Hughes opined that Relator suffered from "no objective abnormalities" with respect to her prolonged neck and arm pain. * * * Dr. Hughes went on to opine that, based on this lack of objective abnormality, Relator is not permanently disabled. This finding is wholly inconsistent with not only all of the medical reports of other treating physicians within the file, but with Dr. Hughes' own exam findings. Dr. Lin's reports suffers the same flaw as Dr. Hughes' report.

(Relator's Brief, 15.)

{¶ 55} In the context of workers' compensation cases, equivocal medical opinions are not evidence. *State ex rel. Eberhardt v. Flxible Corp.*, 70 Ohio St.3d 649, 657 (1994). Equivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement. *Id.* Ambiguous statements, however, are considered equivocal only while they are unclarified. *Id.*

{¶ 56} Moreover, it has been repeatedly held that a physician's report can be so internally inconsistent that it cannot be some evidence supporting the commission's decision. *State ex rel. Lopez v. Indus. Comm.*, 69 Ohio St.3d 445 (1994); *State ex rel. Taylor v. Indus. Comm.*, 71 Ohio St.3d 582 (1995).

{¶ 57} However, in mandamus, courts will not second guess the medical expertise of the doctor whose report is under review. *State ex rel. Young v. Indus. Comm.,* 79 Ohio St.3d 484 (1997).

{¶ 58} The evaluation of the weight and credibility of the evidence before it rests exclusively with the commission. *State ex rel. Thomas v. Indus. Comm.,* 42 Ohio St.3d 31, 33 (1989), citing *State ex rel. Burley v. Coil Packing, Inc.,* 31 Ohio St.3d 18 (1987).

{¶ 59} Review of medical reports under the *Eberhardt* standard has been undertaken by the Supreme Court of Ohio and by this court in mandamus cases involving other retirement systems. *Marchiano* at ¶ 34; *State ex rel. Riddell v. State Teachers Retirement Bd.,* 10th Dist. No. 13AP-660, 2014-Ohio-1646, ¶ 22; *State ex rel. Worthy v. Ohio State Hwy. Patrol Retirement System,* 10th Dist. No. 07AP-507, 2008-Ohio-2462, ¶ 74.

{¶ 60} Presumably, this court may also apply the standard set forth in *Lopez, Taylor,* and *Young* in reviewing medical reports involving OPERS.

{¶ 61} In his report, under the paragraph captioned "Physical Examination," Dr. Hughes reports that "triceps reflexes are * * * absent on the left."

{¶ 62} Also under the paragraph captioned "Physical Examination," Dr. Hughes reports "diminished light touch sensation affecting the left third and fourth fingers on the ulnar aspect of the forearm."

{¶ 63} Under "Review of Medical Records," Dr. Hughes lists and briefly describes seven imaging studies (x-rays, EMG, MRI) that can arguably be called, in the words of relator, "objective clinical findings." (Relator's Brief, 15.)

{¶ 64} While the September 29, 2011 and December 11, 2012 EMGs of the upper extremities were reported to be normal, the remaining five imaging studies are not reported to be normal. For example, the January 4, 2013 MRI of the left shoulder indicated "rotator cuff tendinosis" and a "partial bursal tear."

{¶ 65} Regardless of whether a doctor may conclude that the imaging studies do not compel the conclusion that relator is disabled from her former employment as an LPN, it is difficult for this magistrate to agree with Dr. Hughes' statement "as there are no objective abnormalities." Certainly, for example, "rotator cuff tear tendinosis" and a "partial bursal tear" are not normal. Likewise, it is difficult for this magistrate to accept the notion that the "small protrusion at C4-5 and C5-6 and disc desiccation and degeneration at C2-3, C3-4, C4-5 and C5-6" is a normal finding.

{¶ 66} Moreover, in his response to "Issue #6" in his report, Dr. Hughes states:

> The claimant's subjective complaints and symptoms correlate with my objective, clinical findings (absence of left triceps reflex and diminished sensation of the left third and fourth fingers).

{¶ 67} In short, according to Dr. Hughes, the claimant's subjective complaints and symptoms correlate with some of his clinical findings but not all of his clinical findings.

{¶ 68} In its brief, OPERS points to other statements made by Dr. Hughes as quoted by OPERS here:

> Dr. Hughes noted that some of Smith's subjective complaints correlated with his objective clinical findings. * * * However,

Dr. Hughes did not find that these impairments rose to the level of a disability. Dr. Hughes stated, "[t]here is no objective medical evidence to support disability. The diagnosis is based on the patient's self-reported complaints of neck and left arm pain, which have been consistent over an extended period of time. * * * Dr. Hughes stated, "[t]he cause of her pain has been uncertain, as has been described by her physicians ... The cause of her ongoing neck and left arm pain is unclear in so far as history and physical findings, MRI imaging and electromygraphical studies are concerned." * * * Dr. Hughes wrote, "[t]he claimant's current diagnosis is neck and left arm pain of uncertain cause. However the diagnosis is not disabling at this time." * * *

(Respondent's Brief, 5-6.)

{¶ 69} In the magistrate's view, taken in the context of the entire report, even if Dr. Hughes' single statement "as there are no objective abnormalities" can be viewed as inconsistent, the error is not fatal. Clearly, not every perceived flaw in a medical report is grounds to eliminate the report from evidentiary consideration. *State ex rel. Warnock v. Indus. Comm.*, 100 Ohio St.3d 34, 2003-Ohio-4833.

{¶ 70} The magistrate finds that the following discussion in the *Eberhardt* case is applicable here:

[E]quivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement.

* * *

[A]mbiguous statements are inherently different from those that are repudiated, contradictory or uncertain. Repudiated, contradictory or uncertain statements reveal that the doctor is not sure what he means and, therefore, they are inherently unreliable. Such statements relate to the doctor's position on a critical issue. Ambiguous statements, however, merely reveal that the doctor did not effectively convey what he meant and, therefore, they are not inherently unreliable. Such statements do not relate to the doctor's position, but to his communication skills.

*Id.* at 657.

{¶ 71} Accordingly, the magistrate concludes that relator has failed to show that the report of Dr. Hughes must be removed from evidentiary consideration.

## Dr. Lin's Report

{¶ 72} In her brief, relator asserts: "Dr. Lin's report suffers the same flaw as Dr. Hughes' report." (Relator's Brief, 15.) Beyond that simple assertion, no argument is presented as to why this court must conclude that the report of Dr. Lin must be removed from evidentiary consideration.

{¶ 73} Loc.R. 13 of this court sets forth this court's rules regarding original actions. Loc.R. 13(J) is captioned "Briefs." Thereunder, the rule provides that the brief of the plaintiff shall, among other things, provide an argument. Loc.R. 13(J)(4) states:

> An argument. The argument shall contain the contentions of the plaintiff with respect to the issues presented, and the reasons therefor, with citations to the authorities and statutes relied on.

{¶ 74} Relator's assertion that "Dr. Lin's report suffers the same flaw as Dr. Hughes' report" is not an argument under Loc.R. 13(J)(4). This court is not required to develop an argument that relator may have had with respect to the report of Dr. Lin.

{¶ 75} Accordingly, relator has failed to show that the report of Dr. Lin must be removed from evidentiary consideration.

## Dr. Hawkins' Reports

{¶ 76} As earlier noted, on July 10, 2014, at the request of OPERS, relator was examined by Dr. Hawkins who had previously examined on May 2, 2013 for the bureau.

{¶ 77} On May 2, 2013, Dr. Hawkins examined relator for the purpose of determining whether relator's industrial claim should be additionally allowed for psychiatric conditions. In his report dated May 9, 2013, Dr. Hawkins diagnosed "Depressive Disorder NOS" and "Generalized Anxiety Disorder." He opined that the psychiatric conditions were caused by the workplace accident that occurred on April 19, 2008.

{¶ 78} It is important to note that the bureau did not ask Dr. Hawkins to render an opinion as to disability, and Dr. Hawkins' May 9, 2013 report contains no opinion as to whether relator can return to her former position of employment as an LPN. Dr. Hawkins

does indicate that relator "has not returned to work since the injury." Nevertheless, there is no opinion in the report as to disability.

{¶ 79} In his July 10, 2014 report, Dr. Hawkins opines, as earlier noted "symptoms of anxiety and depression were mild in nature. They do not preclude her from working." Dr. Hawkins further opined "claimant is not presumably permanently disabled for the performance of her own occupation as a public employee."

{¶ 80} It should be noted that, in her brief, relator incorrectly frames the issue by asking whether OPERS acted "unreasonably by relying upon the inconsistent medical reports of Dr. Hawkins." (Relator's Brief, 4.) Later in her brief, relator asserts again that OPERS "unreasonably relied upon the unreliable and inconsistent medical reports of Dr. Hawkins." (Relator's Brief, 20.)

{¶ 81} The evidence of record does not suggest that the OPERS board relied upon both of Dr. Hawkins' reports. Presumably, only the report requested by OPERS was relied upon by OPERS. Presumably, OPERS did not rely upon the May 9, 2013 report of Dr. Hawkins.

{¶ 82} However, even if it can be argued that OPERS relied upon both reports, there is no inconsistency between the reports.

{¶ 83} Relator also asserts:

> The medical report of Dr. Hawkins, which states Relator would not be precluded from passing medication based on her emotional condition, is inconsistent with the objective medical findings of the other physicians who have examined Relator.

(Relator's Brief, 18.)

{¶ 84} The above statement is simply an invitation that this court reweigh the evidence for the OPERS board. That Dr. Hawkins' July 10, 2014 report may be inconsistent with reports of other doctors does not in any way diminish the evidentiary value of Dr. Hawkins' report.

{¶ 85} Accordingly, based upon the above analysis, the magistrate concludes that OPERS did not abuse its discretion by relying on the July 10, 2014 report of Dr. Hawkins.

**Effect of Relator's Involuntary Separation from her Employment**

{¶ 86} As earlier noted, effective September 30, 2011, relator was involuntarily separated from her employment at the Gallipolis Development Center on grounds that she was unable to perform her job duties due to a disabling illness, injury, or condition.

{¶ 87} According to relator, given her involuntary separation from employment, it was "unreasonable" and a "gross abuse of discretion" to deny her application for a disability benefit. (Relator's Brief, 19.) Relator cites to no authority to support her argument. Respondent does not respond to the argument.

{¶ 88} Disposition of this issue is aided by *State ex rel. Schwaben v. School Emps. Retirement Sys.,* 76 Ohio St.3d 280 (1996).

{¶ 89} Harriet I. Schwaben ("Schwaben") began driving a school bus for the Tallmadge City School District in September 1984. As a result of her employment, Schwaben was a member of the School Employees Retirement System ("SERS"). In September 1991, Schwaben was diagnosed by her attending physician, Victoria Codispoti, M.D., as suffering from clinical depression. Dr. Codispoti prescribed Prozac and Desyrel.

{¶ 90} Schwaben stopped driving a school bus in May 1993 and, the next month, applied for disability retirement benefits with SERS.

{¶ 91} In accordance with the procedures set forth in R.C. 3309.39, the SERS board selected Jeffery Hutzler, M.D., to examine Schwaben. Dr. Hutzler concluded that Schwaben was capable of driving a school bus. Dr. Hutzler determined that Schwaben was not incapacitated in any way in her ability to drive a bus. He stated: "[i]n fact, if anything, she is more alert and capable as a driver because she was treated for her depression." *Id.* at 280.

{¶ 92} In September 1993, the SERS medical advisory committee concurred with Dr. Hutzler's findings. Thereafter, the committee chairman recommended to the retirement board that the application for disability retirement benefits be denied.

{¶ 93} Consequently, in October 1993, the board denied Schwaben's application. Schwaben then appealed to the board but failed to submit additional medical evidence as required by an SERS rule. The board denied the appeal and the further request for reconsideration.

{¶ 94} In February 1994, the Summit County Health Department disqualified Schwaben as a school bus driver. She was disqualified on the basis that she used Prozac and Desyrel to control her condition.

{¶ 95} In January 1995, Schwaben filed a mandamus action against SERS in this court. Following this court's denial of the writ, Schwaben appealed as of right to the Supreme Court of Ohio.

{¶ 96} On appeal, in her second proposition of law, Schwaben contented that the determination of whether a disability interferes with a school bus driver's ability to perform his or her job lies solely within the province of the State Board of Education, not SERS. Schwaben suggested that a school bus driver who is medically disqualified from driving a school bus pursuant to former R.C. 3327.10 qualifies, automatically, for disability retirement benefits under R.C. 3309.39. The *Schwaben* court disagreed.

{¶ 97} In explaining its decision, the *Schwaben* court heavily relied upon its prior decision in *Fair v. School Emps. Retirement Sys.,* 53 Ohio St.2d 118 (1978), a case this magistrate will not discuss here.

{¶ 98} In denying the writ, the *Schwaben* court observed that, under R.C. 3309.39, the determination of whether a member of SERS is entitled to disability benefits rests solely within the province of SERS. The *Schwaben* court further noted that to hold otherwise, would place the determination of eligibility for disability retirement within the province of an agency having no responsibilities whatsoever for the administration and control of the retirement funds.

{¶ 99} Applying the reasoning of *Schwaben,* to the instant case, under R.C. 145.35, the determination of whether an OPERS member is entitled to a disability benefit rests solely within the province of OPERS. To hold that the employer can determine whether an OPERS member is entitled to a disability benefit is not supported by any authority submitted by relator.

{¶ 100} Based upon *Schwaben,* the magistrate rejects relator's argument that her involuntary separation from her employment as an LPN at the Gallipolis Development Center requires the OPERS board to grant her application for a disability benefit.

{¶ 101}     Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.


/S/ MAGISTRATE
KENNETH W. MACKE


## NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).